Good morning, Your Honor, members of the Counsel for the State. My name is Jason Carp, Appellant Petitioner, Larry James Plumlee. We come to this case on a 2254 petition on direct appeal, and we stand here, I stand here, fully cognizant of the stringent standard of review that is applied in 2254 cases. The unreasonable application are contrary to clearly established federal constitutional law. We embrace that standard in this case because if there ever was a case that deserved a writ to be granted, it has to be this case. This factual record is great for Mr. Plumlee. This factual record truly establishes his claim of a reconcilable conflict. The Nevada State Supreme Court decisions in this case are terse, unresponsive, and as we'll discuss in a moment, I want to actually put Larry Plumlee in an untenable Catch-22 position. To make things even better, when we actually have one of the cases. Where's the Catch-22? The Catch-22, Your Honor, is this. One of the factors for an irreconcilable conflict claim is the adequacy of the inquiry. When this happens, when there's actually two motions, two hearings on motions to be relieved and an affidavit from counsel, extensive evidence that there's a toxic and extreme conflict between Plumlee and his lawyer. What was the cause of the conflict, counsel? The cause is that there's a variety of grounds for the cause of the conflict. The first one was. What is the evidence of any basis for conflict? What's the evidence? Not the allegations or the assertions, but the evidence of any conflict between these people, other than the statement, the conclusionary statement, we can't get along together. Well, Your Honor, first of all, when you look at irreconcilable conflict, the fact that the whole nature of the inquiry is, is counsel and client able to communicate effectively, is there a constructive denial of counsel? If there is, then you win, unless the State can prove that you were being obstinate or showing undue competency. And that makes sense, because we can't have this policy, this rule of law, where the defendant can construct his own conflict. Isn't that exactly what was found by the State court on the 1998 state abuse case? The reason that there was a irreconcilable conflict was because Mr. Plumlee kept lying about his participation in the crime. One time after another, after another. He kept making up different stories. There's no factual finding in this record from any State court that that was the reason for the conflict. There's none. In fact, Judge Mills Lane finds directly to the contrary. I'll point the Court to an excerpt from record on page 203. And what the State court finds is that Mr. Plumlee's contentions with counsel were reasonable and well-based. Look at page 203. This is the court, the trial court, after a full evidentiary hearing. I couldn't read the judge's signature, but the findings of facts and conclusions of law and judgment. Oh, Your Honor. The written, written findings, that was drafted by the State, Your Honor. And we filed specific objections saying these are directly contrary to the oral findings. Was it signed by the State? Your Honor, it was, but Federal law is legion saying that when the party drafts findings of fact and law, that those are not entitled to wait. That is an inappropriate procedure to engage in. And if there's any case that exemplifies why, it's this one, because they are directly contrary to the oral findings of the court. But that's what the judge signed, right? Your Honor, the judge signed it. You know, he's harried. He gets the findings of fact. He doesn't expect that the State's going to draft them in a manner inconsistent with his oral findings. But the case law is pretty clear that the oral findings govern. Those written findings of fact are very – they just do not accurately reflect the record, plain and simple. This is what the court found after an evidentiary hearing. This is the words of the judge who listened to the evidence, who gauged the credibility of the witnesses on EOR 203. He says, And based upon certainly where I'm sitting, I can't disagree. He had a right to feel that. Certainly he had a right to feel that way for good reason, at least his own. And then he goes on to hold in different – I'll go back to page 206. So are you saying that if the prisoner in a writ of habeas corpus subjectively feels that he has not been well attended by his counsel and thinks that there's an irreconcilable conflict, it's a constitutional error not to appoint separate counsel? Your Honor, the answer to that is no, because it cannot be based purely on the subjective feelings of the defendant that are unreasonable. All right. Then where is the evidence of any of these claimed betrayals by the public defender? Where is the evidence that Ms. O'Neill leaked some information and what was it? Where is the evidence of this? Well, first of all, the judge makes findings on this, Your Honor. Judge Mills Lane talks about the fact that – No doubt. Page 179. What I was asking is, where is the evidence? Did Ms. O'Neill testify? They testified. And did she testify that she gave information to Dewey? Now, but here's what – Mills Lane doesn't necessarily believe that after listening to the witnesses. He doesn't believe – John Dewey says that that doesn't happen, but he says I don't believe you. He didn't believe who, Ms. O'Neill? Or John Dewey. What he says is that this is what he says. Number two, I think that Ms. O'Neill and the public defender's office was in dangerous waters. Certain inferences can be drawn from what was going on in this case, in the case, and her relationship or lack thereof with Mr. Dewey. What was said and what was not said to various people, I think that is extremely dangerous. I further think, and I'd like to have him here to testify. I probably wouldn't unless the prosecution was going to bring him in. I think it's terribly improper to, you know. Then he goes off into the other aspect, which is that the first attorney went to work for the DAs. Besides the musings by the judge, which I think those are, where is the evidence that Ms. O'Neill told Dewey anything about Plumlee's case? Point to me a record evidence. Okay. Well, when Dewey testifies, he testifies, and that begins in the excerpt of record on page 144 approximately. I'm sorry, a little bit earlier, 141. He testifies he had this relationship with O'Neill and that he was in contact with O'Neill and her husband and Mr. Plumlee. This is all kind of really, when you get into this, here's what you have to look at. Plumlee, from his perspective, was an object of the case. No, no, pardon me. What I have to look at is what I asked you to give me. Give me page and line number of any evidence that O'Neill told Dewey anything about Plumlee, not what I really have to look at. That's what I want to look at. Can I look at that, please? Well, Your Honor, he testifies that he was in contact with O'Neill, Dewey does, and that he was in contact with Plumlee. O'Neill says that she does not remember giving any confidential information to Dewey. That is what happened. So the only evidence is O'Neill does not remember giving any confidential information to Dewey. Right. Correct? Right. But we learned the whole story. What really happened here is important. And also what's important is we have to look at this from the perspective of Mr. Plumlee. The objective person in Mr. Plumlee's perspective, position, what would he think? What happened here is that Dewey, what actually happened, we learned six years later, because the Court doesn't do an adequate inquiry at the trial level, but we learned six years later is what happened was Dewey was contacted by the Sparks police. He went into the Sparks police, and the Sparks police told him that Mr. Plumlee and this is in the record in Mr. Dewey's testimony, that Mr. Plumlee has fingered you in this murder. And that Mr. Dewey doesn't really goes and talks to Plumlee the next day, but he doesn't remember exactly what's said, which Moss Lane doesn't believe. He says you go to your grave remembering what you said there, and now you're telling me you don't believe it. That's not what he said in his order, Stein, but go ahead. Right. And I was right that that order should be entitled to no wait. And we also filed specific objections to that order after it was entered and said this is not right. This order does not comport with your findings, and that is ignored. No court makes these findings. Did he strike the order? Did he perform the order in any way based on that motion? No, but he didn't rule on the motion either. It was essentially ignored. But, Your Honor, we have to look at this. Okay. The whole thing about confidential information being leaked, that's one fact. And what confidential information was it? Excuse me? What confidential information was it? That Mr. Plumlee was telling his attorney at that time, Mr. Allison, that this other Mr. Dewey may have been the real perpetrator of the murder. And that information went from Allison to O'Neill to Dewey? Well, Mr. Allison, what happened was that Dewey comes back to Plumlee when Plumlee is in jail and gives Plumlee information that he knows he's been fingered in the murder. And what Plumlee leaks to this conclusion, which may not have been accurate, we learned six years later, that that was leaked by his attorney. Now, it turned out the Sparks Police Department told that to Dewey. Maybe they were playing a game on Dewey. Maybe they were. But it's also suspicious here because at the time his attorney, who eventually goes to work for the DA, may have been incurring favor with the DA's office. So where did the Sparks Police learn that Dewey, that Plumlee was fingering Mr. Dewey? Can we go beyond suspicion to some evidence that would justify a finding of a conflict? Well, what kind of conflict, Your Honor? There are three kinds, actual, potential, and irreconcilable. Is there evidence in this record that there was a toxic and extreme irreconcilable conflict between a client and attorney? There is copious amounts of it. Based on Mr. Plumlee's suspicion that somebody had leaked some information. But if that suspicion, if that suspicion is baseless, all right, are we in a position where we're going to say that a baseless information, a baseless suspicion can give rise to an irreconcilable conflict and therefore the public defender's office cannot represent this defendant? An inference can be wrong but reasonable. And what Judge Nose Lane finds is that Plumlee had a reasonable basis for drawing these inferences, that the facts supported that. From his point of view, he can understand it. He can understand. I'm sure I can understand why he felt the way he did. A factual finding. No, no, no. I'm sure I can understand. It does not mean that there's a reasonable basis for the feeling. It means that he understands, this man in jail, how he feels and why he feels that. Well, okay. There's a leaking of the information that's highly suspicious. We don't learn that maybe information wasn't leaked until six years later, which right off the bat tells us the inquiry wasn't adequate at the trial court level because this was never fleshed out. Secondly, what else do we have? Well, we have the whole problem with this first attorney going to work for the DA. And Plumlee testifies that the DA – now, you have to remember, Plumlee was arrested in April 1991. He doesn't – the whole attempt to get removed, relief, doesn't happen until a year later. The trial doesn't occur until September. The first motion – September of 1992, the first motion to be relieved from the Washoe County Public Defender's Office happens in May. So we have a whole year where Plumlee is represented by the Washoe County Public Defenders. In the beginning, we have this – whatever happened with – that gave Plumlee this idea that information was being leaked. Okay, what's the next thing we have? Well, the next thing we have is that his first attorney went to work for the DA's after representing him for many months. And Plumlee testified that the attorney did not tell him he was going to work for the DA. And then he asked him, are you going to go work for the DA's, because I heard a rumor you are. And he told him no, that I'm not. And then, sure enough, like a week later, he goes to work for the DA's. Now, there's a factual finding on this from Mills Lane. And what does he say? He says that that – and we can go look at it. It's on page 154. Oh, I'm sorry, this is the right page. It's here in the record where he says that Allison did – that he believes that Allison did not tell him that he was going to work for the DA's. He says – and this is on page 179. I further think, and I would like to have him here to testify, well, I believe Mr. Allison did not – did know that he was going to become a deputy district attorney and did not tell your client that. And I think that is extremely out of line. I think it's unprofessional. I don't think there's anything wrong from going from one side of the street to the other, so long as certain professional standards are kept up and met. I think it is inappropriate to tell a client facing a murder charge things that aren't  And I think that's probably what happened in this case. So factor number two, and we have a factual finding to support this from the trial judge who heard the evidence, that Plumlee had a reasonable basis for developing distrust because his first attorney worked for the DA's and didn't bother to be honest with him about that intention. And as – this is Mr. Plumlee's first time that he's ever in custody. He has his first attorney. He believes information is being leaked. We may later on – maybe it wasn't. Maybe it was just an unfortunate set of circumstances with the Sparks police essentially lying to Dewey, as they do when they interrogate. But then we have this next incident where he doesn't tell them he's going to work for the DA's and then he goes to work for the DA's. What else does he have as a reasonable basis for why he lost faith? Well, let's look at page 201 of the excerpt of the record. And here we have the investigator for the Washoe County Public Defender's Office. And one of Plumlee's complaints is, I lost faith in them because they didn't do any investigation in my case. Well, what does Mr. O'Brien, the investigator, say? Well, he says, I'm the – this is on page 201 of the excerpt of the record. And this is an investigator testifying. And the question is, are you aware of any investigation that Mr. Allison did, the first attorney who went to work for the DA? Investigator, no, I'm not. All right, did you do any investigation for Mr. Allison? Basically, I conducted a polygraph exam at his request. The only investigation that Mr. Allison did was subject his client to a polygraph exam? This is months after he's been in custody on a murder charge? And why is he subjecting his client to a polygraph exam? We have no explanation. And Plumlee testifies about it, too. He just comes in here and gives me a polygraph exam. I have no idea why. You wouldn't do that to your client. I mean, that's going to develop distrust. What other things do we have? Well, we have the lost bail order, which is the final straw for Plumlee, where the first judge did, in fact, enter a bail order. His – Gregory's second – successor client loses the bail order, tells our client and this is in the evidentiary hearing transcript, that you must need psychiatric treatment if you think there's been a bail order. It turns out there was a bail order all along and that Judge Mills Lane does not go along with that original bail order because he thinks that that judge applied the wrong legal standard. And so our client loses faith in his attorney because he lost his bail order. After he's been in custody for a year, he's trying to get out on O.R., his attorney is telling him there is no bail order when, in fact, there was a bail order all along and that's even in the excerpt for record. So we have all these objective factors that we can point to for why Plumlee lost faith in his attorney. And then we have – and we have strong, extreme evidence in this record that there was a complete breakdown of the attorney-client relationship. Both the attorney and Mr. Plumlee said, we don't trust each other, we don't talk to each other, I can't represent him. The attorney even begged the judge. He literally said, I am begging you to be relieved from this case. Mills Lane did not allow for alternate substitute counsel, and he said very clearly why, and there are two reasons. One, the Washoe County public defenders are good lawyers. Two, financial, economic policy concerns. And he says this clearly in the record. Those are my reasons for doing it. I'm not even going to consider appointing substitute counsel. And we know from the case law that both of those two reasons are wrong. You can't face a motion – you can't deny a motion to substitute counsel based on the fact you think his counsel is competent. That's not the issue. And you certainly can't do it based purely on economic policy grounds, which Judge Mills Lane says. There's no doubt about it that he says that. Now, what happens? Now, this fills up. After the trial court-level proceeding, Mills – there's no hearing, there's no – and Newton – the case Newton tells us exactly what kind of inquiry we need to have. It says that on page 1004, that, for an inquiry regarding substitute counsel to be sufficient, the trial court should question the attorney or defendant privately and in depth and examine available witnesses. Neither of that happened at the trial court-level. Mills Lane made his decision based – he said why he made it. I'm not going to substitute – appoint substitute counsel because of policy grounds and because I think your counsel is fine. Well, what happens? Six years later, there's a hearing. Mills Lane hears the evidence and says, well, wait a minute, you had a reasonable basis for this. You know, and if the Supreme Court hadn't already ruled, this would be a different kettle of fish. He strongly intimates after the post-conviction – the post-conviction hearing that he would give him relief on this ground. Now, the Nevada Supreme Court, on the writ of mandamus, which is located on page – on page 110, what they say is that Plumlee failed to prove his allegation that the public defender's office is failing the main confidentiality. First of all, they say, well, you have to prove that there was a breach, which isn't the right inquiry. The inquiry and the factual finding needs to be made, which has never been made in this case by any court, is was there a toxic conflict between the attorney and counsel? No court has ever made that find. Second of all, they say, well, you didn't prove your allegations. And then on the direct appeal, they say essentially the same thing. Well, we already found you didn't prove your allegations. And then when there finally is a hearing six years later and Plumlee finally gets the opportunity to prove his allegations, the trial court finds them well taken and that he had a reasonable basis for the conflict. And the Nevada Supreme Court says, well, we already ruled on this. Sorry. It's a law of the case. In fact, it wasn't law of the case. Either you had an opportunity to develop the facts in postconviction and get a separate ruling, or the initial inquiry was inadequate. You can't have it both ways. I mean, the State is just in deep trouble on this case. The factual record is so good for Plumlee here. And Shelby Wydick tells us that we don't examine prejudice. When there's a constructive denial of counsel, when we prove up that claim, we don't look at the trial record, we don't look at what happened. There's no way to do it. It's structural error. In this case, Mr. Plumlee was denied his right to counsel. His conviction is invalid. And it should be reversed. And I'd like to reserve the rest of my time for rebuttal. And your position is it's structural error? It's Shelby Wydick says that, Judge. And that's an en bloc opinion. Good morning. My name is Vic Schulze. I'm from the Attorney General's office in Las Vegas. From my perspective, the central issue in this case is that Mr. Plumlee, from the very beginning, sabotaged his own defense. And he sabotaged the relationship he had with his own lawyers. In the 1997 habeas evidentiary hearing, when he took the stand and the various attorneys took the stand, and the defense attorney's investigator took the stand, the issue is, John, that Mr. Plumlee repeatedly, from the very beginning of the representation, lied about the most fundamental issues that the defense attorneys needed to craft a defense in this case. There may have been a conflict between the attorney and the client. But to the extent that there was a conflict, it was created by Mr. Plumlee. So why isn't that enough? I'm sorry? Why isn't that enough? Let's assume, for the sake of argument, that Plumlee comes in and he concocts all these wild stories, and then he finally confesses to his lawyer. And his lawyer said, you know, I can't represent you and I can't ethically disclose it. And goes to the judge and says, we need out because I can't represent this guy anymore. Why shouldn't he? Why isn't he entitled to a new lawyer at that point? I'm speaking hypothetically. I know it's not quite as good. Yeah, I understand. And I certainly appreciate the logic of the question. First of all, it encourages, as a policy issue, it encourages manipulation. Anytime a defendant feels that the case isn't going his way, he simply will invent some kind of conflict by not cooperating with his lawyer that will allow criminal defendants with appointed counsel, which this case was, simply to manipulate the system repeatedly. And ultimately, most serious cases that are bad for the defense would never end up going to trial because you'd get into the, you'd get into that sort of circle where you're going through attorney after attorney. When you go through all the defense attorneys in the county, I don't know what the court's supposed to do. I'd also point out that. But that happens from time to time. I mean, we see it and it's unfortunate, but trial judges maybe grant one substitution, they grant two, and they say no more. And here, right out of the chute, both the attorney and the client come in and say, we can't work with each other. And then the only option is given is self-representation. In fact, they objected to be standby counsel, if I'm recalling from the trial transcript. They said, we can't work with him anyway, and we're not going to work with him as standby counsel. The record from the June 9, 1992, hearing on this issue seems to indicate actually that they did maintain a working relationship. Plumlee did maintain one with his attorney, because the court, who was very active in questioning Mr. Plumlee at this, at these numerous hearings they had on this issue, asked at one point in time, asked Mr. Gregory, do you trust Mr. Gregory? And the defendant said, yes, sir. He said he trusted him. I'd also point out that when. That was in May of 92. He changed his tune in June. This was the, I think this was the hearing in, this was the hearing in June 9, 1992, that I'm quoting from. The issue, the difficulty, I think, in this case. That was May 22, 1992, at ER 65-1. ER 65. That's what I have, Your Honor. I may be reading the filing date. I apologize. So in May he trusted Gregory and thought he was competent. He did. But then in June he turned around, I guess he, for whatever reason, and thought that Gregory wasn't competent. And Gregory didn't want to do the standby job, but he did. The, what the defense attorney and the investigator testified to, I think, is core to this issue, and that is that at one point in time, Plumlee, Plumlee's attitude, there's something from the record that is absolutely, I've been doing habeas for in the record when Plumlee testified at that 1997 hearing. Plumlee, years later, five, six years later after the trial, Plumlee maintained the attitude, I'm paraphrasing, but he maintained the attitude that toward his attorneys, I'm going to tell you what I think you need to know. I'm going to lie to you, but I'm going to tell you what I think you know, and you better damn well represent me somehow and do an investigation somehow in spite of the fact that I am only going to tell you what you need to know. The Court about a week and a half ago, I don't know exactly what the term is, you expanded the EOR, you requested the entire transcript of what had originally started on 139 of this 1997 hearing. This is not in the EOR that was provided by the public defender, but you have this because you requested this, I think, by minute order. On page 54 of this, the defendant at one point in time says, all Mr. Allison needed to know was I did not commit the murder. If Mr. Allison had done the investigation, it would have showed everything else. What he says on this page and around this, around after this page, is that he was going to tell the attorneys what he thought they needed to know. It wasn't going to answer their questions. He was simply going to tell them what he thought they needed to know, and then they would investigate the case. And I would suggest to you that that's what created the conflict in this case, that he wasn't cooperating. He was hiding information. The lawyer and the investigator testified that he had eight or nine different versions of the case. And a sort of relevant fact here is whether or not he was at the murder scene. He originally said he was not. Then he was. But the investigator, I think it was the investigator, testified at that hearing that he would provide a story. They would go out and investigate the story and come back and say, there's some problems with what you're telling us. He would then change his story. They would go out and investigate. They'd come back and they'd say to him, there are holes in your story. He'd give them another version. That was the quality of the relationship. I've never been a defense attorney, but I don't know how a defense attorney crafts a defense when the target's moving all the time. I don't know what he expected them to do, but the central issue here is to the extent that they had a strained relationship, he created it. Could I ask you a question concerning what Mr. Carr said? As to the written order following the 1997 habeas corpus evidentiary hearing, signed by Fighting Judge Mills Lane, dated January 15, 1998, are we to disregard that because you prepared the ‑‑ did you prepare the findings of law, the findings affecting conclusions of law? That would have been one of the deputy DAs in Washoe County, a state representative who did that. Are we to disregard the effect of that order and the findings therein because it was prepared by the prevailing side? No, I certainly hope not. I think it's fairly common in most state courts, and as a matter of fact, we have a judge in Las Vegas, a federal judge in Las Vegas, who requires, at least in habeas cases, the prevailing party to draft those orders. How do we deal with the statements made by Judge Lane at the hearing that Mr. Carr has pointed out appear to be in conflict with these findings? What I would do is go to what the highest state court did rather than focusing on the lower district court. I would go to what the highest state court did and what the Nevada Supreme Court said in their order was very simply the same thing that they had always said when they dealt with the issue on direct appeal. They repeated that in the habeas case, and that was that Plumlee never showed that there was a conflict. He sort of suspected one. He beat around the bush. But when push came to shove and he got all these hearings, he never proved the existence of a conflict. One really interesting thing. Do you think he has to do that? I'm sorry? Do you think he has to do that? I mean, if he reasonably believes that there's a conflict and there's evidence in the record to suggest that his belief was reasonable, though erroneous, is that enough or not enough? No, it's not because the standard has to be an objective standard. Under Kyler v. Sullivan, under Schell v. Witek, it's got to be an objective standard. Right, but is it objective as to the true facts or objective as to his beliefs about the true facts? I think it has to be a reasonable person's standard has to apply under those controlling cases. But could not a reasonable person believe that the leaks came out of the public defender's office? No. And let me point out something that was something interesting that happened in another case. There was another hearing. This case. No, no, I'm sorry. In another hearing in this specific case. On EOR page 59, this theory on this leak. First of all, I'd point out there was never any evidence put on as to the source of this supposed leak. At one point in time, the judge at one of these hearings on EOR 59, the judge is questioning Mr. Plumlee, and Mr. Plumlee takes this same amorphous theory of all these leaks and everybody's talking to these folks. Apparently the allegation is it's going through the sister. That seemed to be the story. He turns this on the judge in the hearing. And the defendant says, I believe, and he's talking to the judge, he says, I believe you spoke to my sister this past week. You were going into the specifics about my case. The exact same argument. The same thing he accused Shelly O'Neill of. Now he's accusing the judge of it. The judge says, I did not. The defendant says, you didn't. The court says, no, your sister called. She complained. Your sister called. I advised Mr. Gregory, the defense attorney. She complained about what was happening or not happening with the public defender's case. I advised your sister I could not discuss the case with her. She should contact John Morrow. And that's up to the public defender what to do about it. And then the defendant says, well, correct. That's what I was talking about. The point is, Mr. Plumlee has this argument in his mind. He wants to convince somebody of this argument that he's pushing that there's this leak. So not only is he accusing Shelly O'Neill, who works in the PD's office, of the leak, but he's also accusing the court of leaking. I mean, he wants somebody to be leaking this information. The fact of the matter is how did the leak prejudice Plumlee? Well, there was no leak. All right. Had there been one? If there had been one. It didn't. Well, it would not have, because the Plumlee, Plumlee's inconsistent on this issue, too. Plumlee at one point in one of these hearings says, I did not believe Dewey, the architect, was a suspect. I did not mean to implicate him. But then at one point in time, the attorneys or the investigators said, well, he did implicate him. I don't remember how, but he did implicate him. The problem with Plumlee is he did not take Mills Lane's advice and avoid having a fool for a client when you represent yourself. He was trying to craft, was told repeatedly by Mills Lane, you know, don't, in the Feretta stuff, even before the Feretta campus, this isn't going to work. You're going up against these lawyers. But this guy thought he knew more than the judge. He knew more than the lawyers. He was going to tell them what they thought they needed to know, and they better damn well go out and do something with it. And he wasn't going to give them any more, and he was going to lie to them, and he was going to change his story repeatedly. This is not an easy case to defend for these. This is one of the first times in my life I've ever felt bad for a defense attorney, I have to admit. But they had a difficult client, to put it mildly. Counsel, the bottom line here is that we have a murder trial. I've never seen a murder trial where someone isn't represented by counsel. And the counsel did not want to represent him. That's clear, absolutely clear. They did not want to represent him. And it seems to me that in that circumstance, the court has to appoint other counsel. I appreciate your concern, and I think it's a valid concern in the general kind of case. The difficulty in this specific case is that to the extent there was stress in that relationship, it was caused by Plumlee. I don't think it matters at the bottom line who caused it. Here we are, the public defender says, we don't want to represent this guy. But they did represent him. They did the investigation. When they were asked, how much investigation did you do, the attorney was asked that question at that 1997 hearing. It was the day of trial. I understand, I understand. But at the hearing after the fact, when the attorney was asked, did you do any investigation, he said, we did extensive investigation into this case. Every time we investigated a lead, the problem was Plumlee had given us bad information. And so the one question in this case is, can a defendant sabotage his own defense, then turn around and claim, I've got a conflict. When we have, there was no evidence here that there was a complete breakdown in communication. There's no evidence that the Washoe County public defender abandoned their client and stopped working on the case. The evidence in the hearing was they continued to work on the case, didn't like this guy, but of course there's no right to a meaningful relationship with your client. They may have been at each other's throats, but they communicated. They put on the defense. They continued to work for him when they were appointed as standby counsel. And ultimately the issue is, can a defendant, in my view, can the defendant sabotage his own defense, repeatedly lie, in spite of the fact that the PD is communicating, is moving forward with a defense. It's easy, though. On the day of trial, this is what, or close to trial, Gregory says, he doesn't trust us and frankly, Judge, I don't trust the relationship I have with Mr. Plumlee. I feel very uncomfortable talking to him one-on-one because of certain things that have occurred I can't relate to the court, that I cannot relate to the court. Correspondence that has happened, I've told Mr. Plumlee I won't have any contact with him unless another individual from the public defender's office is present. He doesn't trust us. I'm not sure we trust him. I'm going to beg the court to appoint outside counsel. But I mean, the question is, and you read this, and you have the same concerns I think we do, that the defender, the public defender at that point is in such a terrible position because he's forced to go either be standby counsel or counsel to a person he doesn't want to represent, who he doesn't trust. The relationship is about as irretrievably broken as one can see. So given that, regardless of who caused it, why doesn't the right to counsel Because there's nothing in the record. There is evidence in the record that you just read from that they didn't like each other. There was a lot of stress and there was a lot of tension. But there's no evidence in the record of a breakdown in communication or that the public defender's office ceased doing their duty to create a defense for Mr. Plumlee. And in fact, the evidence in the transcript is they did their duty. They did the investigation. Every single lead he gave them, they investigated. They didn't like him. Absolutely. But you don't have to like your client. You simply have to do your duty to defend him. You have to communicate with him. And they did that. That was done. And that's a key issue here. Except that they didn't represent him. I mean, they were relieved of their representation. They were relieved at his insistence. I would point something else out here that's really interesting. There was a Feretta canvas in addition to Judge Lane repeatedly telling him, you are going the wrong way. When they did the formal Feretta canvas, there's no challenge in front of this court right now to the formal Feretta canvas. There was a formal Feretta canvas. Mr. Plumlee was told repeatedly about the shortcomings of this theory that he wanted to represent himself. He was insistent on it. The issue here is because this case lies at the intersection, in my view, between Feretta and Kyler versus Sullivan in the line of cases dealing with a complete breakdown. Because there is no allegation that the Feretta canvas was bad, he has to show objectively under the reasonable person standard that there was a conflict not caused by himself that led to either a complete breakdown in communication or the public defender just breaching their duty and saying, we can't work with you. And that never happened. They did their duty. Why do you say not caused by himself? Picking up on the question that Judge Thomas asked you. Because of the line of cases from, in our brief, from the Supreme Court and this Court that say that a conflict in this case cannot be created by the defendant, number one. Number two, because... What kind of, what case is that? I can't, I don't have it right in front of me, Your Honor. In your brief? Yes, sir. And secondly, it's in the Kyler and Schell line of cases. Secondly, it's based on the policy argument that a defendant cannot be allowed to manipulate the system to the point where he creates the issue by lying to his attorney repeatedly and then comes in and says, oh, we have a bad relationship. Well, yeah, you may. But the key issue here is the public defender didn't like this guy, but they were always willing to do their duty. They may have disliked him actively, but they did the investigation. I mean, they followed the court order. They communicated. I'm sorry? They followed the court's order and they tried to act professionally, but they're begging the judge to get out of the case. But I would point to the highest court and what the Nevada Supreme Court said was you simply have not proved that there was a conflict sufficient to require the court under the Sixth Amendment to appoint you new counsel. And that is the order under 2254d that was objectively reasonable under U.S. Supreme Court rulings under the Sixth Amendment. And under the cases for the EDPA, for the 2254d standard, this Court, Judge Hagan felt obligated to uphold what the State Supreme Court did, and we would argue that what Judge Hagan did vis-a-vis the State Supreme Court's ruling was reasonable and not in opposition to anything the U.S. Supreme Court had done. Thank you. Thank you. I would, first off, note during the Feretta canvass, Mr. Plumlee lets it be known clearly why he's going Feretta. When the judge, on page 91, the judge is asking him, do you want to go forward and represent yourself, do it yourself, he calls it. I don't have a choice, Your Honor. And the court says, well, you do have a choice. I don't want you to posture it that way. You have a choice. The choice you don't have unless I'm otherwise by the Supreme Court. You do not have a choice in this Court appointing somebody other than the public defendant. Mr. Plumlee makes clear the only reason why he's representing himself is because the court won't appoint substitute counsel, and the court makes clear that it indeed is not going to do that on page 91. There is no factual finding by Mills Lane that the reason for this conflict was caused by Mr. Plumlee's obstinacy or his failure to communicate with counsel. And it's clear that my opposing, honored opposing counsel never has been a defense attorney if he thinks there's something unusual about your client telling you something that doesn't prove to be true after investigation. That is certainly the average criminal defendant right there. And Mr. ---- He might be a little bit lower than average, but in my experience, very seldom does a defense, a defendant tell the whole truth to his lawyer. In fact, you are afraid to ask him, did you do it? You would never ask that question. I would never ask that question. No. And Mills Lane makes specific factual findings that Plumlee's distrust of the Washoe County public defenders was reasonable, and he makes it on a different, on a variety of basis, one of which was that Mr. Allison, his first attorney, was not effective. And on page 179, in my view, Mr. Allison did not do the kind of job a good first rate defense counsel would do. Now, Vivian, the difficulty is that I think as Judge Baez said, those are sort of musings. I don't know if you can credit them as findings. And I understand your objection to the findings as issued, and they are somewhat at odds to the statements made in the hearing. That's for sure. He doesn't like Mr. Allison. He shouldn't give those credence. As I say in my reply brief, there's a lot of Federal case law that says it's improper to have the opposing party draft the findings of fact and law. Yeah. But if you look at Mills Lane, he's the one who hears the evidence. So the State is always so fond of pointing out, oh, it's the State factual findings. It's clear, convincing, burden-proof. Well, we're entitled to factual findings that benefit us. And the factual findings that the judge made after this hearing are all favorable to us. He finds that Allison was lazy. Judge Lane says flat out, Mr. Allison was lazy. He's not a good attorney. I've seen him for many years. He tells Mr. Plumlee, I understand why you felt the way you did. You thought information was being lazy. Was there a claim of ineffective assistance of counsel as to Mr. Allison? No. But here's the thing. That's amusing. That's not a finding. But what we were looking at, did Mr. Plumlee have a reasonable basis for not trusting him? If his counsel is not doing a good job and not doing any investigation, well, that's a basis for not trusting your counsel. And that's all that those findings are relevant to. And he says flat off, first, it's clear that he didn't trust, that Mr. Plumlee didn't trust, didn't like the public defender's office, he says for a reason. And he said, Mr. Lane said, I'm doggone sure I understand why Mr. Plumlee felt the way he did. After hearing all the evidence. If you look on page 179, he admits that this was not flushed out at the trial court level. He says, I was not, I was aware of a little bit of what was going on. I wasn't aware of the depth of it. You didn't have it flushed out. You've done a good job flushing it out here. What does that say about the adequacy of his inquiry at the trial court level? He's admitted, Judge Mills Lane says at 179, I did not have all the information. He gets all the information. He makes findings of facts favorable to Mr. Plumlee. And I see that I've gone over time. And I, all I would suggest to the Court that in this case, this record is very important. Mr. Plumlee has met the stringent standards for the issuance of a writ of adequacy report. Thank you. Thank you both for your arguments. Very helpful to the Court. I think these cases at the intersection of Fred and the Sixth Amendment are very difficult. The next case on the oral argument calendar is United States v. Martin and Dobson. Good morning. I'm Cynthia Fort.
judges: B. Fletcher, Thomas, Bea